1

2

3

4                    IN THE UNITED STATES DISTRICT COURT

5              FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7    CHEVRON CORPORATION,                     No. 09-05371 CW

8            Plaintiff,                       ORDER GRANTING
                                              DEFENDANTS' ANTI-
9      v.                                     SLAPP MOTION TO
                                              STRIKE, GRANTING
10   CRISTÓBAL BONIFAZ and THE LAW OFFICES    PLAINTIFF'S
     OF CRISTÓBAL BONIFAZ,                    MOTION FOR LEAVE
11                                            TO SUBMIT
            Defendants.                       ADDENDUM TO
12   _____/     SUPPLEMENTAL
                                              BRIEF AND DENYING
13                                            PLAINTIFF'S
                                              MOTION FOR LEAVE
14                                            TO FILE A MOTION
                                              FOR
15                                            RECONSIDERATION
                                              (Docket Nos. 25,
16                                            54, 60)

17

18        Plaintiff Chevron Corporation brings this action for malicious

19   prosecution against Defendants Cristóbal Bonifaz and The Law

20   Offices of Cristóbal Bonifaz (collectively, Bonifaz).  Bonifaz has

21   moved to strike Chevron's action pursuant to California's anti-

22   Strategic Lawsuit Against Public Participation (SLAPP) statute,

23   Cal. Civ. Proc. Code § 425.16.  On May 12, 2010, the Court granted

24   Bonifaz's motion in part, deferred its decision in part and

25   afforded Chevron sixty days to conduct discovery.

26        The parties have filed supplemental briefs.  Chevron moves for

27   leave to file an addendum to its supplemental briefing and a motion

28   for reconsideration of the Court's May 12, 2010 Order.  Bonifaz

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

opposes Chevron's motions.  The motions were taken under submission
on the papers.  Having considered the papers submitted by the
parties, the Court GRANTS Chevron's motion for leave to file an
addendum, DENIES Chevron's request for leave to file a motion for
reconsideration and GRANTS in full Bonifaz's anti-SLAPP motion to
strike.

BACKGROUND

The current malicious prosecution suit arises from the
initiation and continued prosecution of claims in <u>Gonzales v.</u>
<u>Texaco Inc.</u>, No. 06-02820 WHA (N.D. Cal.).  Because the Court's May
12, 2010 Order provides sufficient background on the <u>Gonzales</u>
action, only the relevant allegations and facts will be discussed
here.

I.   Underlying Case

In April, 2006, nine plaintiffs from the Amazon rainforest
region of Ecuador brought claims against Chevron and two of its
subsidiaries, Texaco and Texaco Petroleum Company (TexPet).[1]  The
plaintiffs claimed they suffered injury arising from pollution
allegedly caused by Texaco and TexPet's oil exploration and
production activities in that region of Ecuador.  Bonifaz
represented the plaintiffs, along with other attorneys, including
Terry Collingsworth, Paul Hoffman, Othni Lathram, Dennis Patanzis
and Natacha Thys.

In bringing the case, Bonifaz and his co-counsel relied on
information furnished by Dr. Gerardo Peña Matheus, an attorney

---

[1] For brevity, the Court hereinafter refers to the <u>Gonzales</u>
defendants as Chevron.

2

practicing in Ecuador with whom Bonifaz had previously worked. Peña, along with his paralegals, identified and interviewed the <u>Gonzales</u> plaintiffs.  Bonifaz never met with the plaintiffs.

Luisa Maribel Jame Gonzales, one of the plaintiffs, alleged that she "was diagnosed with breast cancer in April 2005" and that her exposure to the pollution "caused her physical injury on a cellular and subcellular level, impairing her immune system and substantially increasing her risk of developing cancer and/or other latent diseases." <u>Gonzales</u> 2d Am. Compl. ¶ 8.  Her husband, Nixon Rodriguez, likewise alleged that the pollution impaired his immune system and increased his risk for cancer and disease.  In addition, he averred that he suffered emotional distress, incurred medical expenses "for his own medical monitoring and for his wife's medical monitoring and treatment" and experienced a loss of consortium. <u>Id.</u> ¶ 13.  Gloria Carmina Vera Chamba alleged that, in October, 2002, her son was diagnosed with leukemia.  She also averred harm to her immune system and an increased risk of disease.  These <u>Gonzales</u> plaintiffs, along with the six others, sought recovery for negligence, intentional or reckless infliction of emotional distress and battery.

The plaintiffs did not prevail; all of their claims were dismissed with prejudice or summarily adjudicated against them. Also, the court, on its own motion, imposed monetary sanctions under Federal Rule of Civil Procedure 11 against Bonifaz, Collingsworth and Hoffman, based on the claims asserted by Jame, Rodriguez and Vera.  <u>Gonzales v. Texaco Inc.</u> (<u>Gonzales Sanctions Order</u>), 2007 WL 3036093 (N.D. Cal.).  Collingsworth and Hoffman

3

appealed the sanctions; Bonifaz paid the sanctions and did not appeal.  The Ninth Circuit vacated the award of sanctions and remanded the matter for further proceedings.  <u>Gonzales v. Texaco Inc.</u>, 344 Fed. App'x 304, 308-09 (9th Cir. 2009).  On remand, the <u>Gonzales</u> court declined to impose sanctions.

II.  Current Action

On November 13, 2009, Chevron initiated its current malicious prosecution action, only against Bonifaz.  It avers that the prosecution of the <u>Gonzales</u> action was part of an extortion scheme by Bonifaz and others.

On January 13, 2010, Bonifaz filed his motion to strike Chevron's action as a SLAPP.  Chevron opposed the motion, asserting that it demonstrated a sufficient probability of success on the merits because it substantiated its allegations that Bonifaz lacked probable cause to bring and maintain the <u>Gonzales</u> action.  As relevant here, Chevron argued that Jame's intake form failed to provide Bonifaz with probable cause to bring claims on her behalf. It also pointed to Jame's May, 2007 deposition testimony that, two months earlier, she had told Lathram and Patanzis that she did not have cancer.  Chevron offered no evidence that Bonifaz knew of this purported statement, but argued that he should have known about it and dismissed Jame's claims as a result.

As noted above, Rodriguez's claims were based, in part, on damages purportedly related to his wife's alleged cancer.  Chevron asserted that Bonifaz lacked probable cause to bring Rodriguez's claims because Rodriguez never submitted an intake form and never expressed to Bonifaz that he suffered the harm alleged.

4

**United States District Court**
For the Northern District of California

Finally, Chevron maintained that Bonifaz lacked probable cause to bring Vera's claims because her intake form did not reflect the complaint's specific allegations that her son had leukemia but only that she suspected he had cancer. Chevron also argued that Bonifaz lacked probable cause to maintain her suit after he obtained her son's medical records, which did not mention leukemia.

In its May 12, 2010 Order, the Court struck most of Chevron's action. As relevant here, the Court concluded that Chevron did not satisfy its prima facie burden to show that Bonifaz initiated or continued to prosecute claims by Rodriguez and Vera without probable cause. The Court also held that Chevron failed to substantiate its allegation that Bonifaz lacked probable cause to bring suit on behalf of Jame, but deferred ruling on whether Chevron met its burden as to his continued prosecution of her claims. In particular, the Court found, Bonifaz may have lacked probable cause to pursue her claims if he knew of her purported statement that she did not have cancer. Chevron was granted sixty days to conduct discovery on this issue.

III. Facts

Chevron did not provide any additional evidence on the issue for which the Court granted discovery. The state of the evidence on the issue remains that Lathram and Patanzis deny that Jame told them that she did not have cancer and deny that they told Bonifaz that she did not have the disease. Bonifaz denies that he was told.

Instead, Chevron asserts that the record supports an inference that, by at least December, 2006, Bonifaz knew that Jame did not

**United States District Court**
For the Northern District of California

have breast cancer.  Chevron possessed most of the evidence on which it now relies for this claim when it first opposed Bonifaz's motion to strike, but did not present it at that time.

In December, 2006, the <u>Gonzales</u> plaintiffs' attorneys produced documents to Chevron, including medical reports referring to diagnostic tests conducted on Jame.  In a report dated August 16, 2006, a pathologist from the National Oncology Institute in Ecuador stated that a biopsy of tissue from Jame's right breast did not reveal any "malignant neoplastic changes" and diagnosed her with an "ectopic mammary gland."  Nierlich Decl., Ex. 14.  The report did not indicate when the tissue had been removed.  The December, 2006 document production also included two ultrasound reports.  Nierlich Decl. ¶ 16.  One report dated August 4, 2006 stated that an ultrasound of Jame's breasts did not show any solid nodules.  Nierlich Decl., Ex. 15 at 2.  However, solid nodules were observed later, according to another ultrasound report dated December 1, 2006.  <u>Id.</u> at 3.[2]  Neither of the ultrasound reports indicated the dates of the tests discussed.  In his deposition, Bonifaz stated that he knew that a biopsy report was produced to Chevron, but there is no evidence that he knew of the contents of the biopsy report or of the ultrasound reports.  There is no evidence of the medical significance of the biopsy and ultrasound reports.

On February 27, 2007, Chevron was served with Jame's supplementary interrogatory responses, signed by Collingsworth with the initials of Thys.  The following interrogatories and answers

---

[2] The two ultrasound reports were in Spanish.  Chevron did not provide English translations.

United States District Court
For the Northern District of California

1    were contained therein:

2        INTERROGATORY NO.6:
         For each physical or emotional injury suffered by YOU
3        that YOU allege was caused by any act or omission of
         DEFENDANTS, separately describe each injury and with as
4        much detail and specificity as possible the circumstances
         of the injury including without limitation when
5        DEFENDANTS' acts or omissions first produced the injury
         in YOU, when symptoms of the injury began and what those
6        symptoms were, when and by whom YOUR condition was
         diagnosed and when the injury ended if it has.

7
         . . .
8
         ANSWER NO.6
9        I do not know with medical certainty when I was injured
         the first time.  Now I am in treatment in SOCAL
10       (Guaranda).  I was diagnosed with a tumor in my armpit in
         2006.  I am convinced that I suffer from cancer.
11
         . . .
12
         INTERROGATORY NO.8:
13       For each physical or emotional injury suffered by YOU
         that YOU allege was caused by any act or omission of
14       DEFENDANTS, describe with as much specificity and detail
         as possible the circumstances of the discovery of the
15       cause of the injury, including without limitation when,
         how and who discovered the cause of YOUR injury and when,
16       how and from whom YOU discovered the cause of YOUR
         injury.
17
         . . .
18
         ANSWER No. 8
19       I went to the doctor who detected the tumors.  Dr. Manuel
         Jimenez told me that this was because pollution.  Texaco
20       works near the 10 of August farm and I believe that they
         provoked my illness with their pollution.
21
     Nierlich Decl., Ex. 17 at 7-8.
22
         On March 29, 2007, Chevron's counsel sent a letter to Thys and
23
     Collingsworth, requesting additional information concerning Jame's
24
     alleged disease.  In an April 2, 2007 email to his colleagues,
25
     Bonifaz indicated that "the new attorneys" would "meet with the
26
     clients on April 22-25 and will cure any deficiencies in the
27

28                                  7

United States District Court
For the Northern District of California

responses upon their return in plenty of time for the scheduled depositions at the end of May." Nierlich Decl., Ex. 13 at 2.

On April 22, 2007, Lathram and Patanzis traveled to Ecuador to meet with the plaintiffs, along with Dr. Juan Romero, who is licensed as a physician in Honduras and worked in the United States as a medical technician. Lathram, Patanzis and Romero met with Jame on this trip.

Romero interviewed Jame and conducted a basic physical examination. At the time of their meeting, Romero apparently did not have access to all of Jame's medical records. See, e.g., Nierlich Decl., Ex. 8, Patanzis Depo. 72:22-73:9, 120:17-121:10. However, Jame provided a biopsy report and an "ultrasound photograph." Nierlich Decl., Ex. 10, Lathram Depo. 125:13-126:5. The biopsy report was the above-mentioned August 16, 2006 report, a copy of which had been produced to Chevron in December, 2006. Id. at 103:18-104:12; Nierlich Decl. ¶ 15. Presumably, the ultrasound photograph referred to one of the ultrasound reports described above.

In his report, Romero indicated that Jame had a family history of breast cancer. He also stated that she experienced "oppressive pain" in her right arm and "on her right breast and the right side of her chest that also radiates to her back." Nierlich Decl., Ex. 16 at 2. Further, he noted that a "report showed she had an ectopic breast gland," id., apparently referring to the August 16, 2006 biopsy report. He also noted that a "Right Breast Nodule" was removed in December, 2006. Id. It is not clear whether this was the solid nodule observed in the December 1, 2006 ultrasound

8

report.  His physical examination of Jame revealed "no masses" in her breasts.  Id. at 2-3.  Romero did not opine as to whether Jame had breast cancer.  On May 2, 2007, Bonifaz received Romero's report, but testified that he did not read it.

On May 4, 2007, the Gonzales plaintiffs' counsel held a telephone conference, during which Romero's findings were discussed.  Bonifaz did not deny that he participated in the call.  The attorneys discussed how to develop a "fuller interrogatory response."  Nierlich Decl., Ex. 10, Lathram Depo. 47:6-7.

On May 9, 2007, Chevron was served Jame's amended supplemental interrogatory responses, which were signed by Thys.  The following supplemental answers to the interrogatories described above were included therein:

> ANSWER NO.6
> I do not know with medical certainty when I was injured the first time.  I began experiencing symptoms of pain sometime in 2005.  In February 2006, the pain was very severe.  I had this pain on my right arm that moves to my back and my chest.  I also had numbness and weakness in the same arm.  At this time, I sought treatment for the pain with Dr. Manuel Jimenez in Archidona who detected a growth in my armpit/breast area.  This same month, I had a biopsy on my right breast in February 2006 with Dr. Martha Vargas of SOLCA (Guayaquil).  Later in August 2006, I had an ultrasound of my right breast.  This was done by Dr. Victoria Gordilla also at SOLCA (Guayaquil).  I then saw Dr. Raul Goatherd at SOLCA (Guaranda) sometime in September or October 2006 and he told me that because of the tumor I had to be under observation and undergo treatment.
>
> . . .
>
> ANSWER No. 8
> I went to the doctor who detected the tumors, Dr. Manuel Jimenez.  He told me that my tumors were because of pollution.  I believe he explained this to me February 2006.  Texaco works near the 10 of August farm so I did believe that they provoked my illness with their pollution after speaking with Dr. Jimenez.  The oil is on

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

> the ground where I live and on the trees.  It gets on my
> skin and on my clothes so I understood I had been
> affected by the pollution.  There is no way to get it off
> other than to use diesel fuel.  I also drink the water
> from wells where I live.  I must add Clorox to use for
> cooking, cleaning and bathing.

Nierlich Decl., Ex. 19 at 5 and 7.

On May 28, 2007, Jame was deposed through an interpreter.  On several occasions, Jame appeared not to understand the questions asked by Chevron's counsel, who, during the deposition, moved to strike many of her answers as non-responsive.  <u>See, e.g.</u>, Bonifaz Decl. in Support of Mot. to Strike, Ex. I, Jame Depo. 33-61. Approximately two hours into the deposition, the following exchange took place between Chevron's counsel and Jame:

Q    . . .  You didn't know that you had breast cancer, did you, when you sued?

A    Yes.

Q    But you still sued Texaco for money, didn't you?

A    Yes.

Q    Claiming that you had breast cancer, even though you knew -- didn't know whether you did or not?

A    Yes.

Q    Ms. Jame, when was the first time you knew you didn't have cancer?

A    When I was given the biopsy from SOLCA.

Q    Did you tell your lawyers at that time that the biopsy showed you didn't have cancer?

A    Yes.

Q    When was that?

A    It was about two months ago.

Q    Who did you tell?

10

1      A     My attorneys.

2      . . .

3      Q     So you told your attorneys two months ago that you
             do not have cancer?

4

5      A     Yes.

       Q     Is it the attorneys Mr. Patanzis and Mr. Lathram
6             that are sitting in the room?

7      A     Yes.

8  Nierlich Decl., Ex. 21, Jame Depo. 61:3-62:10.

9         Although the questions and Jame's answers were, at times,

10  ambiguous and convoluted, they could be construed to mean that Jame

11  did not know with certainty whether she had breast cancer at the

12  time the lawsuit was filed in April, 2006.  However, she clearly

13  had reason to believe then that she had cancer.  At around that

14  time, a mass had been observed in her right breast, and her doctor

15  had referred her to the National Oncology Institute for a biopsy.

16  Her pain and other symptoms were apparently similar to those of her

17  aunt, who had been diagnosed with breast cancer.  See Bonifaz Decl.

18  in Support of Mot. to Strike, Ex. I, Jame Depo. 45:6-16.

19        Her belief by the time of her deposition that she did not have

20  cancer seemed to be based on the biopsy.  Her statement that she

21  told Lathram and Patanzis that she did not have cancer correlates

22  roughly with their visit to Ecuador, at which time she gave them

23  the August 16, 2006 biopsy report.  However, this was the report

24  that Chevron already had, which did not rule out a cancer

25  diagnosis.

26        As noted above, Lathram and Patanzis deny Jame told them she

27  did not have cancer and deny they told Bonifaz this.  Further,

28                                    11

Bonifaz denies that he was told that Jame told Lathram and Patanzis that she did not have cancer.

In an attempt to demonstrate that Lathram knew Jame did not have cancer, Chevron proffers handwritten notes that contain the words "Not Cancer" in the context of other phrases that Chevron maintains are associated with Jame.[3]  These notes were found in a journal that Lathram's former law firm produced in response to Chevron's subpoena for documents related to this case; the custodian of records certified that the journal was "prepared by" Lathram.  Mot. for Leave to File Supp. Brief, Ex. 2.  Chevron did not ask Lathram to authenticate the notes or explain their meaning; it obtained the notes after his deposition.  Nevertheless, Chevron maintains that they were his and demonstrate that he knew that Jame did not have cancer.  Even if these notes supported the inferences Chevron draws from them, they do not indicate that anyone communicated to Bonifaz a belief that Jame did not have cancer.

On June 15, 2007, Chevron moved for terminating sanctions or, in the alternative, summary judgment.  Referring in large part to Jame's deposition testimony, Chevron asserted that terminating sanctions were warranted because she had deceived the court.  In response, Lathram filed a brief stating that Jame had provided "information which became the basis of this action which was not fully accurate," Nierlich Decl., Ex. 6 at 2, although he did not specify what was inaccurate.  Lathram asked the <u>Gonzales</u> court to dismiss Jame's and her husband's claims.  In the alternative,

---

[3] The Court GRANTS Chevron's motion for leave to file an addendum to its supplemental brief.

**United States District Court**
For the Northern District of California

Lathram sought leave to amend Jame's complaint based on medical tests, taken after Jame's deposition, that purportedly "revealed the existence of an ovarian abnormality which may be cancerous in nature." Id. The Gonzales court rejected these requests and imposed terminating sanctions and summary judgment against Jame. Order of Aug. 3, 2007, at 6, Gonzales v. Texaco, 06-2820 WHA (N.D. Cal.).

                                DISCUSSION

I.   Bonifaz's anti-SLAPP Motion to Strike

     California's anti-SLAPP statute provides,

        A cause of action against a person arising from any act
        of that person in furtherance of the person's right of
        petition or free speech under the United States
        Constitution or the California Constitution in connection
        with a public issue shall be subject to a special motion
        to strike, unless the court determines that the plaintiff
        has established that there is a probability that the
        plaintiff will prevail on the claim.

Cal. Civ. Proc. Code § 425.16(b)(1). California anti-SLAPP motions to strike are available to litigants proceeding in federal court. Thomas v. Fry's Elecs., Inc., 400 F.3d 1206, 1206 (9th Cir. 2005). Courts analyze these motions in two steps. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." Equilon Enters. v. Consumer Cause, Inc., 29 Cal. 4th 53, 67 (2002). Second, the court "determines whether the plaintiff has demonstrated a probability of prevailing on the claim." Id.

     At the second step, which is often described as the "minimal merit prong," a plaintiff must show "only a minimum level of legal sufficiency and triability." Mindys Cosmetics, Inc. v. Dakar, 611

United States District Court
For the Northern District of California

F.3d 590, 598 (9th Cir. 2010) (citations and internal quotation marks omitted).  "To establish 'minimal merit,' the plaintiff need only 'state and substantiate a legally sufficient claim.'"  Id. (quoting Jarrow Formulas, Inc. v. LaMarche, 31 Cal. 4th 728, 741 (2003)).  "'Put another way, the plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'" Mindys, 611 F.3d at 599 (quoting Wilson v. Parker, Covert & Chidester, 28 Cal. 4th 811, 821 (2002)).  A "defendant's anti-SLAPP motion should be granted when a plaintiff presents an insufficient legal basis for the claims or when no evidence of sufficient substantiality exists to support a judgment for the plaintiff." Price v. Stossel, ___ F.3d ___, 2010 WL 3307482, at *6 (9th Cir.) (citation and internal quotation marks omitted); see also Mindys, 611 F.3d at 599 (stating that an anti-SLAPP motion should be granted if "'the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim'" (quoting Wilson, 28 Cal. 4th at 821)).

A claim for malicious prosecution requires a plaintiff to prove that a defendant's earlier litigation:

> (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in [the plaintiff's] favor; (2) was brought without probable cause; and (3) was initiated with malice.

Estate of Tucker ex rel. Tucker v. Interscope Records, Inc., 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Zamos v. Stroud, 32 Cal. 4th 958, 965 (2004)) (emphasis in original).  Liability can also

United States District Court
For the Northern District of California

lie for "continuing to prosecute a lawsuit discovered to lack probable cause." Zamos, 32 Cal. 4th at 973.

"The tort of malicious prosecution is disfavored both because of its potential to impose an undue chilling effect on the ordinary citizen's willingness to report criminal conduct or to bring a civil dispute to court and because, as a means of deterring excessive and frivolous lawsuits, it has the disadvantage of constituting a new round of litigation itself." Zamos, 32 Cal. 4th at 966 (citation and internal quotation marks omitted). "A preferable approach is 'the adoption of measures facilitating the speedy resolution of the initial lawsuit and authorizing the imposition of sanctions for frivolous or delaying conduct within that first action itself.'" Wilson, 28 Cal. 4th at 817 (quoting Sheldon Appel Co. v. Albert & Oliker, 47 Cal. 3d 863, 873 (1989)). The California Supreme Court has cautioned against expanding the scope of the tort. See Zamos, 32 Cal. 4th at 966.

With these policies in the background, California courts have delineated rules to govern the probable cause analysis. First, "the existence or nonexistence of probable cause is a legal question to be resolved by the court in the malicious prosecution case; litigants are thus protected against the danger that a lay jury would mistake a merely unsuccessful claim for a legally untenable one." Wilson, 28 Cal. 4th at 817 (citing Sheldon Appel Co., 47 Cal. 3d at 874-77). Further, the probable cause inquiry is objective and made "without reference to whether the attorney bringing the prior action believed the case was tenable." Wilson, 28 Cal. 4th at 817. Probable cause "exists if any reasonable

15

attorney would have thought the claim tenable." Id. (citation and internal quotation marks omitted).  The California Supreme Court has emphasized that this is a "rather lenient standard," which ensures that only "those actions that any reasonable attorney would agree are totally and completely without merit may form the basis for a malicious prosecution suit." Id.  In assessing legal tenability, a "court is to construe the allegations of the underlying complaint liberally, in a light most favorable to the malicious prosecution defendant." Sycamore Ridge Apartments, LLC v. Naumann, 157 Cal. App. 4th 1385, 1402 (2007) (citation omitted).

Attorneys will be deemed to have lacked probable cause to bring or maintain an action if (1) they relied upon facts which they had "no reasonable cause to believe to be true" or (2) if they sought "recovery upon a legal theory which is untenable under the facts known to" them. Soukup v. Law Offices of Herbert Hafif, 39 Cal. 4th 260, 292 (2006) (citation and internal quotation marks omitted).  "In a situation of complete absence of supporting evidence, it cannot be adjudged reasonable to prosecute a claim." Id.  However, despite adverse evidence, an attorney may act reasonably by continuing to litigate claims "in light of the possibility that the defense will . . . prove less than solid." Zamos, 32 Cal. 4th at 970 n.9.

If "there is a dispute as to the state of the defendant's knowledge and the existence of probable cause turns on resolution of that dispute . . . the jury must resolve the threshold question of the defendant's factual knowledge or belief." Sheldon Appel, 47 Cal. 3d at 881.  However, if there is no dispute as to the facts

16

known by the attorney in prosecuting the underlying action, "the question of whether there was probable cause to institute that action is purely legal." <u>Ross v. Kish</u>, 145 Cal. App. 4th 188, 202 (2006).

As noted above, the Court deferred deciding whether to strike Chevron's action insofar as it rests on Bonifaz maintaining Jame's claims.  The question left open was whether Bonifaz knew that he did not have probable cause to continue to prosecute Jame's case because she purportedly told Lathram and Patanzis that she did not have cancer.

Jame's deposition testimony in May, 2007 that she did not have cancer appeared to be based on the August 16, 2006 biopsy report, which Chevron had already received in December, 2006.  Jame had shown Lathram, Patanzis and Romero the report during their April, 2007 visit to Ecuador.  This could explain Jame's statement that, about two months before her deposition, she told Lathram and Patanzis that she did not have cancer, a belief she formed based on a biopsy.  Nierlich Decl., Ex. 21, Jame Depo. 61:14.  However, there is no medical evidence that the biopsy report showed Jame did not have cancer, especially in the light of the subsequent ultrasound finding of solid nodules and removal of a nodule.  In sum, the biopsy report does not establish that Jame did not have cancer, even if she thought that it did.

At any rate, Chevron offers no evidence that Bonifaz knew what Jame told Lathram and Patanzis.  Jame testified in her deposition that she had told Lathram and Patanzis that she did not have cancer; the attorneys maintain that she did not.  To impeach

Lathram's testimony, Chevron points to handwritten notes, asserts that they are his and argues that they demonstrate that Jame told him that she did not have cancer.  Even if the notes supported the inferences Chevron advocates, they are not probative of whether Lathram or Patanzis told Bonifaz what Jame said she told them. Lathram, Patanzis and Bonifaz say they did not; Chevron offers no evidence to suggest that they did.

Having failed to unearth new evidence on this issue, Chevron instead now argues that other evidence supports an inference that Bonifaz knew, irrespective of any statement by Jame, that she did not have cancer.  As noted above, most of the evidence on which Chevron now relies, such as the biopsy and ultrasound reports, was available at the time it filed its opposition to Bonifaz's motion. Chevron, however, did not refer to this evidence then.

First, Chevron repeats its argument that Bonifaz lacked probable cause to bring Jame's claims because, although she represented that she had cancer, she did not substantiate it with any medical evidence.  The Court rejected this argument in its May 12, 2010 Order.  Generally, "a lawyer is entitled to rely on information provided by the client."  Daniels v. Robbins, 182 Cal. App. 4th 204, 223 (2010) (citation and internal quotation marks omitted).  Such reliance is reasonable until "the lawyer discovers the client's statements are false."  Id.  Chevron points to no evidence that, at the time he initiated the suit based on the information provided by Peña, Bonifaz had reason to know that he would not be able to obtain evidence to support Jame's belief that she had cancer.  See id. at 222.  Indeed, it was not unreasonable

18

United States District Court
For the Northern District of California

for Bonifaz to rely on information furnished by Peña.   In <u>Schwartz v. Millon Air, Inc.</u>, the Eleventh Circuit reversed a district court's award of sanctions, which was based on a conclusion that the plaintiffs' counsel unreasonably relied on information obtained from an attorney practicing in Ecuador.   341 F.3d 1220, 1224-28 (11th Cir. 2003).   The court stated,

> This case involves special circumstances.  It involves great distances across international borders.  It also involves foreign languages and foreign cultures.  And it involves medical records and a great many clients. Taking these uncommon circumstances into consideration, we cannot conclude that Appellants acted much (if at all) outside of the range of reasonable conduct by relying upon the representations of Briones, the duly licensed Ecuadorian counsel who referred the cases to them.

<u>Id.</u> at 1226.   That Jame did not present Bonifaz, through Peña, with medical evidence did not render her claims legally untenable.   And that Bonifaz could have investigated her claims further does not expose him to liability for malicious prosecution; "the adequacy of an attorney's research is not relevant to the probable cause determination."   <u>Sheldon Appel Co.</u>, 47 Cal. 3d at 883.

    Thus, to substantiate its malicious prosecution claim, Chevron must present sufficient evidence to support an inference that Bonifaz subsequently learned that Jame did not in fact have cancer and failed timely to dismiss her claims.   It does not do so.   The record does not contain evidence that would inform any reasonable attorney that Jame did not have cancer.   Nor is there evidence that Bonifaz knew that Jame was cancer-free.

    The August 16, 2006 biopsy report of tissue from Jame's right breast revealed no "malignant neoplastic changes" and reflected a pathologist's diagnosis of an "ectopic mammary gland."   Nierlich

19

United States District Court
For the Northern District of California

Decl., Ex. 14.   These terms are not defined in the record.   An
August 4, 2006 report noted that an ultrasound test did not show
solid nodules in Jame's breasts.   A later December 1, 2006 report
noted that an ultrasound test did reveal solid nodules.   In his
May, 2007 report, Romero noted that a breast nodule had been
removed in December, 2006 and that he had not observed masses in
Jame's breasts in April, 2007; he did not opine, however, as to
whether she had breast cancer.   Chevron offers no evidence to
support an inference that these ambiguous reports would have
communicated to any reasonable attorney that Jame did not have
cancer.   There is no medical evidence as to the significance of
these observations.   Nor is there any expert testimony that Jame is
cancer-free.   These reports did not require Bonifaz to dismiss
Jame's claims as legally untenable.   Indeed, despite obtaining the
biopsy and ultrasound reports in December, 2006, Chevron did not
move for terminating sanctions until June, 2007.   It continued to
serve interrogatories to clarify Jame's alleged injury.   If the
biopsy and ultrasound reports demonstrated that no reasonable
attorney would have found Jame's claims legally tenable, as Chevron
now suggests, one would expect that it would not have continued
discovery and waited six months to move for terminating sanctions.
To be sure, Chevron's failure to do so does not establish that
Bonifaz had probable cause to continue to prosecute Jame's claims,
but it weighs against a conclusion that the reports plainly proved
her claims meritless.

     The inconclusive medical evidence presented by Chevron is
dissimilar to the type of subsequently discovered evidence that

**United States District Court**
For the Northern District of California

California courts have deemed to extinguish probable cause.  In
Zamos, an attorney asserted a claim for malicious prosecution
against his former client who had brought a fraud action against
him.  32 Cal. 4th at 961.  In the underlying suit, the client
alleged that Zamos made fraudulent representations.  Id.  Shortly
after the client initiated her fraud action, Zamos presented her
counsel with hearing transcripts that clearly contradicted her
allegations.  Id.  For instance, although the client alleged that
Zamos promised to continue to represent her in an action, a
transcript reflected that she did not oppose his motion to
withdraw.  Id. at 971.  The client also alleged that Zamos promised
to represent her in a malpractice lawsuit, even though a transcript
showed that she agreed with him in open court that he was not going
to do so.  Id. at 972.  The California Supreme Court ruled that
these manifest contradictions, along with others, demonstrated a
lack of probable cause to maintain the client's fraud claims, which
substantiated Zamos's claim for malicious prosecution.  Id. at 971-
73.

     In Sycamore Ridge, the lawsuit underlying a subsequent
malicious prosecution action involved claims against an apartment
complex and its management arising from poor living conditions and
unfair business practices.  157 Cal. App. 4th at 1392-93.  The
court concluded that attorneys lacked probable cause to maintain a
client's eighteen causes of action in light of her interrogatory
responses.  Id. at 1403-06.  Although the complaint plead
employment claims, there was no evidence to suggest that the client
was ever an employee of the apartment complex.  Id. at 1403.  The

complaint also plead an emotional distress claim based on the alleged presence of mold in the apartment complex; however, in an interrogatory response, the client stated that she suffered emotional injury because of the management's "dishonesty."  Id. at 1404.  And even though the client stated in another response that she did not suffer any property damage, the attorneys filed a statement on her behalf indicating that she suffered $2,000 in property damage.  Id.

In Zamos and Sycamore Ridge, the malicious prosecution defendants were presented with evidence that clearly negated their clients' claims, vitiated probable cause and eliminated any reasonable belief that they could have rehabilitated the respective lawsuits.

Chevron also argues that Jame's February, 2007 interrogatory responses are evidence that Bonifaz knew that Jame did not have cancer because the statements were evasive, "do not contain the definitive allegation of breast cancer" and "ignore[] the negative biopsy and ultrasound results."  Pl.'s Supp. Brief at 6.  Of course, the biopsy and ultrasound reports had already been provided to Chevron.  There is no evidence that Bonifaz drafted Jame's answers, as Chevron intimates; Jame and Bonifaz's co-counsel, not he, signed the document.  These interrogatory answers do not raise an inference that Bonifaz knew that Jame did not have cancer.

Finally, Chevron complains that Bonifaz did not dismiss Jame's claims immediately following her May 28, 2007 deposition.  As already explained, the basis of Jame's testimony appears to have been the August 16, 2006 biopsy report, which did not establish

22

United States District Court
For the Northern District of California

that she did not have cancer.  Nonetheless, on July 5, 2007, in response to Chevron's June 15, 2007 motion for terminating sanctions and summary judgment, Lathram filed his brief asking the Gonzales court to dismiss Jame's claims or, in the alternative, grant leave to amend her complaint.  Nierlich Decl., Ex. 6 at 2. Although there is no authority that presents a time frame by which an attorney must dismiss a client's case after discovering adverse evidence, it was not unreasonable for Bonifaz and his associates to wait a little over a month to seek leave to amend or dismiss Jame's claims.  Attorneys must be afforded some time to evaluate the best course of action for their clients, in light of adverse developments.  The alternative could encourage the proliferation of malicious prosecution suits and the premature dismissal of clients' meritorious cases by their attorneys who fear tort liability, two results eschewed by the public policy that has limited the scope of the malicious prosecution tort.

The Gonzales litigation ended with the imposition of terminating sanctions against some plaintiffs, including Jame, and monetary sanctions against Bonifaz, Collingsworth and Hoffman. Public policy in California favors deterring meritless litigation by way of sanctions, in lieu of "initiating one or more additional rounds of malicious prosecution litigation after the first action has been concluded."  Sheldon Appel Co., 47 Cal. 3d at 873-74. Although some medical evidence called Jame's case into question, Bonifaz was never presented with any evidence that definitively indicated that she was free of cancer.  To conclude that the equivocal medical evidence Chevron cites obviated probable cause

would elevate the lenient probable cause standard, have a chilling effect on attorneys and litigants prosecuting arguably meritorious actions that involve medical evidence and encourage prevailing defendants to file malicious prosecution suits.

Accordingly, the Court grants Bonifaz's motion to strike in its entirety.

## II. Chevron's Motion for Leave to File a Motion for Reconsideration

Under Civil L.R. 7-9, a party may ask a court to reconsider an interlocutory order if the party can show:

(1) That at the time of the motion for leave, a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought.  The party also must show that in the exercise of reasonable diligence the party applying for reconsideration did not know such fact or law at the time of the interlocutory order; or

(2) The emergence of new material facts or a change of law occurring after the time of such order; or

(3) A manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order.

Chevron argues that Mindys, decided after the Court issued its May 12, 2010 Order, presents a change of law.  In particular, Chevron points to the Mindys court's instruction that, in evaluating whether plaintiffs have demonstrated a "probability of success" under the anti-SLAPP statute's second prong, courts do not "'weigh the credibility or comparative probative strength of competing evidence.'"  611 F.3d at 599 (quoting Wilson, 28 Cal. 4th at 821).  Chevron also highlights the court's explanation that plaintiffs need only make a "sufficient prima facie showing of

United States District Court
For the Northern District of California

facts." _Mindys_, 611 F.3d at 599 (quoting _Wilson_, 28 Cal. 4th at 821).  These principles are not new.  In reviewing the anti-SLAPP analysis, the _Mindys_ court relied on California Supreme Court precedent cited by this Court in the May 12 Order.  Thus, _Mindys_ does not constitute a material change in the law that warrants granting leave.

Chevron also argues that the Court applied a "substantially higher burden" than _Mindys_ requires.  Mot. for Leave at 2.  In particular, Chevron argues that the Court improperly credited Bonifaz's testimony that his associates told him that Vera told them about her son's leukemia.  _See Mindys_, 611 F.3d at 599. Chevron offered no evidence to suggest that Bonifaz's associates did not meet with Vera, that she did not tell them that her son had leukemia or that Bonifaz's associates did not tell him so. Instead, it referred to Vera's intake form, which indicated that she suspected her son had cancer but did not explicitly state that he suffered from leukemia.  In particular, Chevron pointed to "the absence of any date of diagnosis, the lack of any reference to a doctor or any medical records, and the absence of any evidence, or even claim, of causation."  Chevron's Opp'n to Mot. to Strike at 28:3-6.  The intake form is not inconsistent with Bonifaz's statement.  As _Mindys_ instructs, a court should grant an anti-SLAPP motion to strike "'if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.'"  611 F.3d at 599 (quoting _Wilson_, 28 Cal. 4th at 821); _see also Price_, 2010 WL 3307482, at *6 (stating that a court must grant an anti-SLAPP motion if "no

United States District Court
For the Northern District of California

evidence of sufficient substantiality exists to support a judgment for the plaintiff"). Here, Bonifaz's affirmative evidence defeated Chevron's attempt to draw a negative inference, based on the absence of information on the intake form, that Vera never told Bonifaz's co-counsel that her son had leukemia.

Chevron next asserts that the Court ruled contrary to Mindys by concluding that the Gonzales court's sua sponte sanctions order did not substantiate Chevron's malicious prosecution action. However, the Court did take into account that court's subsequently reversed imposition of Rule 11 sanctions. The Gonzales court did not analyze the legal tenability of the plaintiffs' claims under California precedent regarding malicious prosecution. As explained above, California law provides that "the adequacy of an attorney's research is not relevant to the probable cause determination." Sheldon Appel Co., 47 Cal. 3d at 883. Most of the Gonzales court's analysis focused on whether Bonifaz, Collingsworth and Hoffman conducted a reasonable and competent investigation into the Gonzales plaintiffs' claims. See Gonzales Sanctions Order, 2007 WL 3036093, at *11-*12. Chevron does not argue that the sanctions order has a preclusive effect on this Court's decision. Indeed, it would make little sense, given that the California Supreme Court instructs that the imposition of sanctions is the preferable approach to deter frivolous suits, to hold that sanctions could, on their own, support malicious prosecution actions. Absent other indicia of a lack of probable cause to bring or maintain the Gonzales plaintiffs' claims, the sanctions order does not substantiate Chevron's case.

United States District Court
For the Northern District of California

Chevron then maintains that the Court failed to address dispositive legal arguments, particularly by making "no mention of the conflict between the anti-SLAPP statute and Rule 8 . . . ." Mot. for Leave at 4. Mindys, however, countenances the use of the anti-SLAPP statute in federal court, including the "'summary-judgment-like procedure'" employed at the second stage of the anti-SLAPP analysis. 611 F.3d at 599 (quoting Soukup, 39 Cal. 4th at 278).

This Court's decision in Keller v. Electronic Arts, Inc., 2010 WL 530108 (N.D. Cal.), is distinguishable and does not support Chevron's position. That action involves claims for breach of contract and violations of common-law and statutory rights of publicity, among others. The Court's analysis, which was based on a limited record comprised of the plaintiff's pleadings and associated documents, focused primarily on the legal question of whether the plaintiff's right of publicity claims could stand despite one of the defendant's asserted defenses under the First Amendment. Here, in contrast, Chevron asserts a claim for malicious prosecution, which entails review of volumes of evidence presented or generated in the underlying litigation. Based on the elements of that tort, the record before the Court and the standard set forth in Mindys, Chevron fails to substantiate its claim.

Finally, Chevron asserts that the Court failed to consider the Edelman Declaration, filed in support of Chevron's request for a continuance pursuant to Federal Rule of Civil Procedure Rule 56(f). However, the Edelman Declaration, which was considered by the Court, did not raise specific facts relevant to the probable cause

**United States District Court**
For the Northern District of California

1  inquiry, other than those on which the Court granted discovery.

2  Further, the Edelman Declaration did not attest, as required under

3  Rule 56(f), that the sought-after facts existed.  See <u>Family Home &</u>

4  <u>Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.</u>, 525 F.3d 822, 827

5  (9th Cir. 2008).

6       Accordingly, the Court denies Chevron's motion for leave to

7  file a motion for reconsideration.

8                           CONCLUSION

9       For the foregoing reasons, the Court GRANTS Chevron's motion

10  for leave to file an addendum (Docket No. 60), DENIES Chevron's

11  motion for leave to file a motion for reconsideration (Docket No.

12  54) and GRANTS Defendants' motion to strike in its entirety (Docket

13  No. 25).

14       The Clerk shall enter judgment and close the file.  Defendants

15  shall recover costs from Chevron.

16       IT IS SO ORDERED.

17  Dated: 10/8/2010

                                    _Claudia Wilken_____
18                                  CLAUDIA WILKEN
                                    United States District Judge

19

20

21

22

23

24

25

26

27

28                                     28